## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

TERRENCE EDWARD HAMMOCK,

    Plaintiff,

    v.

DIRECTOR GAIL WATTS,
OFFICER J. SHERMAN,
SGT. BOND,
MAJOR ALFORD,
SGT. A. DUPREE,
SGT. A. KELLY,
SGT. B. LITTLE,
J. PAIGE,
SGT. C.E. CARTER,
SGT. B. ROSE,
DOCTOR ZOWIE BARNES,
LIBRARY OFFICERS,
OFFICER BROWN,
OFFICER MISS ALSTON,
DIETARY SGT. C. CARTER,
J. DORSEY,
COMMISSARY OWNER MR. DAVE and
DOCTORS OF UNIVERSITY HOSPITAL,

    Defendants.

Civil Action No.: TDC-22-0482

## MEMORANDUM OPINION

Self-represented Plaintiff Terrence Edward Hammock, who has been detained at the Baltimore County Detention Center ("BCDC") in Towson, Maryland, has filed this civil rights action pursuant to 42 U.S.C. § 1983 alleging constitutional violations arising from poor food quality, limitations on his ability to practice his religion, denial of access to a law library, and inadequate medical care. Defendants BCDC Director Gail Watts, Officer J. Sherman, Sgt. Bond, Major Alford, Sgt A. Dupree, Sgt. A. Kelly, Sgt. B. Little, J. Paige, Sgt. C.E. Carter, Sgt. B. Rose,

Library Officers, Officer Alston, Dietary Sgt. G. Carter, and J. Dorsey (collectively, "the Correctional Defendants") have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 24. Separately, Defendant Dr. Zowie Barnes has filed a Motion to Dismiss. ECF No. 20. Hammock has filed memoranda in opposition to both Motions. Hammock has also filed a Second Motion for Appointment of Counsel, ECF No. 28, and a Renewed Motion to Proceed in Forma Pauperis, ECF No. 30. Having reviewed the submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motions will be GRANTED IN PART and DENIED IN PART, and Hammock's Motions will be DENIED.

## BACKGROUND

Hammock was detained at BCDC on September 20, 2019 on state charges. On December 17, 2021, Hammock was convicted of home invasion, armed robbery, first-degree assault, use of a firearm in a violent felony, and motor vehicle theft but remained detained pending sentencing at BCDC through the date of the filing of his Complaint on February 28, 2022. In the Complaint, Hammock alleges constitutional violations by the Correctional Defendants relating to his conditions of confinement, in violation of the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and Eighth and Fourteenth Amendment claims relating to inadequate medical care against both the Correctional Defendants and Dr. Barnes. Where Hammock references his claims as "issues" numbered from one to eight, the Court will refer to them as Counts 1-8.

## I.    Conditions of Confinement

### A.    Food Quality

In Count 1, Hammock alleges that the food at BCDC violates the Eighth and Fourteenth Amendments because he has received only cold meals for every meal over the course of 29 months According to Hammock, he has complained to Defendants Carter, Dorsey, Watts, and Sherman, who told him "several times" that if he did not eat what was provided, he would not receive another tray.  Compl. at 3, ECF No. 1.  Hammock also asserts that Defendants Bond, Alford, Dupree, Kelly, Little, Paige, Carter, and Rose serve "rotten apples" and meat with "mice bites," which he claims to have made him sick.  *Id.*  Hammock states that he has lost weight because he refuses to eat what is served, that he has not eaten the BCDC food for 28 months, and that he relies on food from the commissary which he purchases with funds provided by his family.

### B.    Religious Services

In Count 2, Hammock alleges that he is of the Islamic faith and that his First Amendment right to free exercise of religion has been violated because he has not been permitted to attend Jumah religious services during the 29 months in which he was in pretrial detention, most of which occurred during the COVID-19 pandemic.  He asserts that Defendants Bond, Alford, Dupree, Kelly, Little, Paige, Carter, and Rose are responsible for this interference with his right to practice his religion.

### C.    Law Library

In Count 3, Hammock alleges that he has been deprived of access to the law library at BCDC over a period of 29 months, in violation of his First Amendment rights.  Specifically, he asserts that from September 20 to December 31, 2019, he was "only allowed to go to the law library a few times to study his case or to prepare a defense for trial," and that the staff at the law

library was "incompetent." *Id.* at 5. Then, in January 2020, the law library was closed down "for months," which Hammock asserts "hindered him from preparing a defense to fight his case at trial." *Id.* at 5-6. Although this time period coincides with the COVID-19 pandemic, Hammock claims that Defendant Brown told him that she shut down the law library so that she could help work in the kitchen. Specifically, he alleges that Defendants Brown and Alston are liable for this violation.

### D.     COVID-19 Quarantine

In Count 4, Hammock alleges unconstitutional conditions of confinement in violation of the Fifth, Eighth, and Fourteenth Amendments based on his claim that in December 2021, his life was deliberately placed in danger when his housing unit was locked down and placed on quarantine for 30 days because three inmates tested positive for COVID-19, but those three inmates were not moved out and remained in his housing unit through at least February 18, 2022. Hammock claims that he "fears for his life every day" because the COVID-positive inmates were not moved out of his housing unit. *Id.* at 6-7. He faults Defendants Director Watts, Bond, Rose, and Carter, as well as Dr. Barnes, for this alleged violation.

## II.    Medical Care

Hammock alleges constitutional violations arising from the failure to properly treat three different medical issues.

### A.     Hernia Care

In Count 5, Hammock asserts that he received inadequate follow-up medical treatment after he had surgery to repair a broken internal hernia filter. When Hammock first arrived at BCDC in September 2019, he informed the medical staff that he had a painful hernia condition. On November 23, 2019, two inmates came into Hammock's cell and kicked him in the stomach,

breaking the internal filter for his hernia.  On February 5, 2020, he had surgery at the University

of Maryland Medical Center ("UMMC") to remove the filter.  In another case that has now been

resolved, Hammock alleged constitutional violations based on the alleged inadequacy of the

medical treatment for this condition before the surgery and the alleged delay in scheduling the

February 5, 2020 surgery.  *See Hammock v. Watts,* No. GJH-19-3575, (D. Md. May 24, 2021).

In the present Complaint, Hammock asserts that a piece of metal was left in his body

following that surgery "because the University doctors said they couldn't get it out."  Compl. at 7.

Hammock alleges that even after the surgery, he continued to pass blood in his urine and stool.

Hammock wrote to Director Watts and Dr. Barnes about his continuing hernia problems, and in

March 2020, Dr. Barnes told him that he would be referred for hernia surgery, but no action was

taken.  On January 27, 2022, Dr. Barnes told him that he would be brought to the medical office

for an examination and evaluation of his hernia, but he was never called for it.  As of Hammock's

submission of the Complaint on February 18, 2022, he had not received the follow-up surgery.

Separately, in Count 8, Hammock alleges that the "University Doctors" who performed the

February 4, 2020 surgery to remove his broken hernia filter are liable to him because they left a

piece of metal inside his body after he signed a document stating that he agreed to have all of the

material removed.  *Id.* at 12.  Hammock does not know the identity of these physicians but requests

the Court's assistance in identifying them.  At this point, they have not been identified or served

with the Complaint.

### B.    Sciatica

Also in Count 5, Hammock alleges that Director Watts and Dr. Barnes have deliberately

deprived him of medical care for sciatica pain in his legs caused by a bullet that is lodged in his

lower back.  Hammock states that the sciatica condition causes a shooting pain through his legs

that is so severe that he often cannot walk for days at a time and cannot eat, and that "all the generic medication" he has been given does not relieve the pain. Compl. at 8. Hammock asserts that Dr. Barnes has refused to provide him with an outside medical consultation or to designate him to reside in a medical unit. Hammock also claims that while Dr. Barnes has directed that he should not be assigned to the top tier of the housing unit and that he should be placed only in a lower bunk, he has been assigned to the top tier of the housing unit.

### C.    Eye Injury

In Count 6, Hammock claims that on March 8, 2021, during an assault by his cellmate, he was hit in the left eye several times, causing several broken bones. Hammock was sent to the eye clinic at Johns Hopkins Medical Center, where the eye specialists informed him that the bones around his eye were broken and that he may need surgery to repair the damage. These doctors provided Hammock with eye drops to address the internal bleeding in his eye. Hammock asserts that during the approximately one year from that incident to the filing of the Complaint, he continued to have problems with his left eye, which he describes as "jumping" of his eye, seeing red, and constant pain when he wakes up. *Id.* at 9. Hammock alleges that Director Watts and Dr. Barnes are liable for constitutional violations because he sent them administrative complaints about this condition on Inmate Request Form #118, but they did nothing to address it.

### III.    Commissary Claim

In Count 7, Hammock alleges that on January 5, 2022, "commissary owner Mr. Dave" illegally removed $17.09 from his account. *Id.* at 11. According to Hammock, this incident occurred after he ordered specific items from the commissary and found that several items were missing from his order. He was nevertheless charged for the missing items, and, despite his requests for reimbursement, the commissary did not refund the money. He filed Forms #118 with

the BCDC shift commander, the deputy administrator, and Director Watts, but he received no reply. Hammock claims that the failure to refund his money amounts to a deprivation of property in violation of his right to due process under the Fifth and Fourteenth Amendments.

## DISCUSSION

### I.      Hammock's Motions

On June 23, 2022, Hammock filed a Second Motion for Appointment of Counsel, ECF No. 28, and a Renewed Motion to Proceed In Forma Pauperis, ECF No. 30.  On April 7, 2022, the Court granted Hammock leave to proceed *in forma pauperis* and denied the First Motion for Appointment of Counsel.  Order at 2-3, ECF No. 8.  The Renewed Motion to Proceed In Forma Pauperis will therefore be denied as moot.  At this stage, this case has yet to proceed to discovery or a trial, so the Second Motion for Appointment of Counsel will be denied for the same reasons that the First Motion was denied. *See id.*

### II.      Defendants' Motions to Dismiss or, in the Alternative, for Summary Judgment

In their Motion, the Correctional Defendants argue that dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56 is warranted because (1) Hammock failed to exhaust administrative remedies; (2) Hammock fails to allege facts sufficient to support a constitutional claim; and (3) the Correctional Defendants are entitled to qualified immunity.  In her Motion, Dr. Barnes asserts that any claims against her in the original Complaint were superseded when they were not included in Hammock's second filing in this case, ECF No. 7, so they are no longer before the Court, and that as to any remaining claims, Hammock has failed to allege a plausible claim for relief.  Count 7 alleges a claim against "Commissary Owner Dave," the owner of the BCDC Commissary, who has not been served in this case, and Count 8 alleges a claim against the UMMC doctors who performed the surgery on Hammock on February 5, 2020,

7

who also have not yet been served. The Court will consider the claims against these Defendants pursuant to 28 U.S.C. § 1915(e)(2), which requires a district court independently to screen and dismiss claims filed by self-represented plaintiffs proceeding *in forma pauperis* if the action is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2) (2018).

### A.    The Operative Complaint

In her Motion to Dismiss, Dr. Barnes takes the position that a March 18, 2022 filing by Hammock entitled "Pleadings," ECF No. 7, constituted an Amended Complaint that superseded the original Complaint filed on February 28, 2022, and that because this second filing did not re-assert claims against her relating to inadequate medical care that were alleged in the original Complaint, those claims no longer exist. In so arguing, Dr. Barnes cites this Court's Case Management Order, docketed on March 1, 2022, which specifies that the Court will construe any subsequent pleading "that attempts to add new factual allegations that are not contained in the Complaint" as an amended complaint, not a supplement, such that it must contain all operative allegations; that it will accept only one such amended complaint before the defendants file an answer or other responsive pleading; and that subsequent pleadings will not be accepted while a motion to dismiss is pending. Case Mgmt. Order § IV. A, ECF No. 3. Although Dr. Barnes reasonably invokes the Case Management Order, the Court finds that ECF No. 7 does not offer new allegations and instead effectively repeats some of the prior allegations and thus does not have to be treated as an amended complaint that supersedes the original Complaint. Under these circumstances, and where at this point the Court must view the pleadings in the light most favorable to Hammock, the Court will continue to construe the original Complaint, ECF No. 1, as

8

the operative pleading, though it will consider the contents of ECF No. 7 as part of Hammock's allegations.

However, pursuant to the Case Management Order, the Court will not consider any of the numerous additional filings after ECF No. 7 to be supplements or amendments to the complaint, and it will not treat any filings other than ECF Nos. 19 and 26 to be briefs that must be considered in resolving the pending Motions. *See* Case Mgmt. Order § IV.A.3; D. Md. Local R. 105.2(a) (limiting a party to one brief in opposition to a dispositive motion).

## B.    Legal Standards

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678.  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

The Correctional Defendants have requested that if the Court does not dismiss the claims against them under Rule 12(b)(6), the Court should treat their Motion as a motion for summary judgment under Rule 56.  When deciding a motion to dismiss under Rule 12(b)(6), the Court generally considers only the complaint and any documents attached to that pleading. *Sec'y of State for Defence v. Trimble Navigation Ltd.,* 484 F.3d 700, 705 (4th Cir. 2007).  Courts must treat such a motion as a motion for summary judgment where matters outside the pleadings are considered

and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party must be afforded "a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

Here, the notice requirement has been satisfied by the title of the Correctional Defendants' Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or an equivalent filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). Hammock has not alleged that he requires discovery to properly oppose the Correctional Officers' Motion.

Under Rule 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with "all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477

U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.*

### C.   Exhaustion of Administrative Remedies

The Correctional Defendants first seek dismissal based on the affirmative defense that Hammock failed to exhaust his administrative remedies. Under the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134 § 803, 110 Stat. 1321 (1996) (codified as amended at 42 U.S.C. § 1997e(a)):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (2018). Inmates must exhaust administrative remedies before they bring any "suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion is mandatory and generally may not be excused unless no administrative procedure is available. *See Ross v. Blake*, 578 U.S. 632, 642 (2016) (holding that an inmate "must exhaust available remedies, but need not exhaust unavailable ones"). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). In *Ross*, the United States Supreme Court identified three circumstances when an administrative remedy is unavailable. An administrative procedure is not available when officers are consistently unwilling or unable to provide relief to aggrieved inmates, the procedure is so opaque that it is practically incapable of use, or prison administrators actively thwart inmates from filing grievances. *Ross*, 578 U.S. at 643-44.

11

BCDC has an administrative complaint procedure under which an inmate with a grievance must first file a complaint on Inmate Request Form #118. Corr. Defs.' Mot. Ex. C at 2-3, ECF No. 24-4. Once received, the complaint is investigated, and a response should be provided within 10 days of the date of receipt. "If the complaint cannot be resolved informally, inmates may request an Inmate Complaint Form #200." *Id.* at 3. The Form #200 must be placed in the housing unit mailbox or given to a supervisor. A response to the Form #200 is due 15 days after the date of receipt. The BCDC process apparently does not include an appeal process beyond Form #200.

The Correctional Defendants assert that Hammock has admitted in his Complaint that he has not exhausted this process. Hammock, however, specifically stated at the outset of his Complaint that he "has filed BCDC 118 complaint forms" relating to these issues. Compl. at 2. He also referenced a "118 complaint" filed in relation to his hernia surgery and stated that he filed "numerous BCDC 118 complaint forms" relating to the commissary issue. *Id.* at 8, 11. At no point does Hammock acknowledge or admit that he did not exhaust the administrative process. Further, with ECF No. 7, which the Court has construed as part of the Complaint, Hammock attached a completed Form #118 relating to his religion claim and letters relating to his food, religion, law library, and medical complaints, accompanied by a BCDC memorandum to him stating that these letters were being construed and processed as Forms #200. Pleading Exhibits, ECF No. 7-1. Notably, Hammock asserts in one of his later filings that he "filed 200 complaint forms and 118's about all these issues." ECF No. 9. Thus, the claim that Hammock admitted that he failed to exhaust administrative remedies is incorrect.

Where exhaustion of administrative remedies is an affirmative defense, the Correctional Defendants must establish that Hammock has not met this requirement. *Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017). Not only have the

Correctional Defendants failed to submit any evidence on this point, such as a certification that Hammock has not filed Form #200 in relation to any particular claim, but Hammock has provided assertions and evidence supporting the inference that he has exhausted such remedies. The Court therefore cannot dismiss Hammock's claims on this basis.

### D.   Conditions of Confinement Claims

#### 1.   Food Quality

In Count 1, the Correctional Defendants assert that Hammock fails to state a constitutional claim in connection with the food served at BCDC. In particular, they argue that although he has generally claimed to have lost weight due to the poor food quality, he has not alleged facts supporting a finding of "a serious or significant physical or emotional injury" resulting from the food served at BCDC. Mot. Summ. J. at 6, ECF No. 24-1.

A pretrial detainee's claims of unconstitutional conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Because a detainee may not be punished prior to an adjudication of guilt, conditions that amount to punishment of a pretrial detainee are prohibited. *Id.* However, "not every inconvenience encountered during pretrial detention amounts to 'punishment' in the constitutional sense." *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (quoting *Bell*, 441 U.S. at 538-40). A particular restriction or condition of confinement amounts to unconstitutional punishment in violation of the Fourteenth Amendment if it is imposed by prison officials with the express intent to punish or it is not reasonably related to a legitimate, non-punitive goal. *Bell*, 441 U.S. at 538-39 (stating that restrictions or conditions that are arbitrary or purposeless may be considered punishment).

On the present issue of constitutional claims relating to food quality, precedent arising under the related context of an Eighth Amendment claim by a sentenced prisoner is instructive.

*Cf. Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021) (applying the Eighth Amendment deliberate indifference standard to a pretrial detainee's constitutional claim relating to inadequate medical care); *Martin*, 849 F.2d at 871 (same). On such a claim, a prisoner must show both (1) "a serious deprivation of a basic human need"; and (2) "deliberate indifference to prison conditions on the part of prison officials." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993). To satisfy the first requirement, the prisoner must demonstrate a "serious or significant physical or emotional injury resulting from the challenged conditions." *Id.* at 1381. Thus, while prisons are required to provide inmates with "nutritionally adequate food" that is "prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it," an Eighth Amendment claim based on poor food quality requires such a showing of an injury or "other diseases" resulting from the food. *Shrader v. White*, 761 F.2d 975, 986 (4th Cir. 1985) (denying an Eighth Amendment claim based on unsanitary food conditions based in part on the lack of evidence of "food poisoning, diarrhea, or other diseases which are indicative of unhealthy conditions in the preparation or handling of food"); *see also Islam v. Jackson*, 782 F. Supp. 1111, 1114-15 (E.D. Va. 1992) (finding no Eighth Amendment violation when a prisoner became ill after being served a meal containing a maggot and meals which were prepared under unsanitary conditions for 13 days in the absence of evidence of "serious medical and emotional deterioration" based on the food conditions). Here, Hammock's assertions that he got sick from the food once and has lost weight are insufficient to meet this standard. Even under the broader requirement that a pretrial detainee may not be subject to punishment, Hammock's allegations fail to support a valid claim that the food provided, even if substandard, amounts to punishment within the meaning of the Fourteenth Amendment. *See Bell*, 441 U.S. at 535. The Motion will therefore be granted as to this claim.

14

### 2.    Religious Services

On Count 2, the Correctional Defendants acknowledge that Hammock has not been afforded the opportunity to attend Jumah religious services while at BCDC. The reason, they assert, is that BCDC was not providing Jumah religious services because of the need for social distancing during the COVID-19 pandemic. They do not specifically state whether BCDC held Jumah religious services before the COVID-19 pandemic, or whether they have held them at any time during Hammock's time at BCDC. However, with his second filing, ECF No. 7, Hammock acknowledged that he was informed that he has not been permitted to attend Jumah religious services because he has been in protective custody, and he attached a Form #118 dated March 10, 2022 in which he requested that he be permitted to attend the "Muslim Jumah services and classes," but a prison official wrote on the form that the request was denied because he "can't be let out to general population because of the protective custody unit." Form #118 at 1, ECF No. 7-1.

A detainee or prisoner has a First Amendment right to free exercise of religion while in prison. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). To state a claim for violation of rights under the Free Exercise Clause, a plaintiff must demonstrate: (1) a sincere belief in a religion; and (2) a prison practice or policy that places a substantial burden on the plaintiff's ability to practice that religion. *See Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017). A substantial burden is placed upon a prisoner's religious exercise when a practice "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). Nevertheless, prison restrictions that impact on First Amendment rights may be constitutional if they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 91 (1987).

In *Firewalker-Fields v. Lee*, 58 F.4th 104 (4th Cir. 2023), the United States Court of Appeals for the Fourth Circuit held that a jail did not violate the First Amendment when it did not provide Jumah prayer services on Fridays, where it depended on outside volunteers and donations to provide group religious services and had not received any relating to Muslim services, and it did not permit inmate-led groups of any kind. *Id.* at 113, 120. It also held that the jail could permissibly bar maximum security inmates from attending in-person religious services for security reasons. *Id.* at 113, 118. Here, to the extent that Hammock's claim relates to the failure to conduct any group Jumah services during the COVID-19 pandemic, such a restriction was plainly reasonably related to the legitimate penological interests of protecting the health and safety of inmates and correctional staff by preventing an outbreak of COVID-19 within the facility. Where there is no allegation that Hammock has been prevented from engaging in individual religious practices, this claim fails because "the pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith." *Firewalker-Fields*, 58 F.4th at 117 (noting that the relevant question is not whether the plaintiff "had the opportunity to engage in Friday Prayer on his terms, but rather whether he could generally engage in worship").

As for any time periods before or after the imposition of COVID-19 restrictions, Hammock's pleading reflects that the reason he has not been permitted to attend religious services is his status as a protective custody inmate. Under these circumstances, and where there is no claim that Hammock has been denied the ability to practice his religion individually, Hammock has not identified a plausible basis to conclude that the failure to permit him to attend services violates his First Amendment rights. *See Firewalker-Fields*, 58 F.4th at 117 (upholding a detention

16

center's prohibition on maximum security inmates attending Jumah services based on security concerns).

### 3.   Law Library

As to Count 3, the Correctional Defendants assert that Hammock has failed to allege sufficient facts to demonstrate a First Amendment violation based on an inability to access the law library. When a prisoner alleges inadequate access to the prison law library, that claim is analyzed as an alleged violation of the First Amendment right of access to the courts. *See Lewis v. Casey*, 518 U.S. 343, 350 (1996); *Bounds v. Smith*, 430 U.S. 817, 828 (1977). "[A] prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997). "[A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense"; rather, the inmate must "demonstrate that the alleged shortcomings in the library . . . hindered his efforts to pursue a legal claim," such as by showing that a claim was dismissed for failure to satisfy a requirement of which he was unaware because of the lack of library access. *Lewis*, 518 U.S. at 351. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" or "arguable" claim was frustrated or impeded because of the denial of access to the courts. *Id.* at 352-53 & n.3. The complaint must contain a sufficient description of the predicate claim to permit an assessment of whether it is "nonfrivolous" or "arguable." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Here, Hammock has alleged only that he was prevented from going to the law library to research his pending criminal case, for which he had a criminal defense attorney. He has not alleged any facts that would demonstrate that his inability to conduct legal research had any

17

specific prejudicial effect on his defense. Absent facts supporting an actual injury, Hammock's First Amendment access-to-courts claim will be dismissed. *See Michau v. Charleston Cnty.*, 434 F.3d 725, 728 (4th Cir. 2006) (holding that an access-to-courts claim failed because the plaintiff's complaints did not "specifically explain how he was injured by any limitations on his access to the law library").

### 4.   COVID-19 Quarantine

As for Count 4, the Correctional Defendants assert that Hammock has failed to allege facts that would support a finding that his constitutional rights were violated when in December 2021, his housing unit was locked down for 30 days after three detainees tested positive for COVID-19, and those detainees were left within the unit. According to the Complaint, the three detainees remaining in the housing unit through at least February 18, 2022.

Protections for individuals confined by the state, whether civilly or criminally, include the right to reasonable safety and adequate medical care. *See Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (holding that prison officials are constitutionally required to maintain "humane conditions of confinement," including "the provision of adequate medical care" and taking "reasonable measures to guarantee the safety of the inmates"). Although Hammock has been in pretrial detention, in the related context of convicted prisoners, in order to establish an Eighth Amendment claim arising from a failure to ensure reasonable safety or provide adequate medical care, a convicted prisoner must demonstrate that the actions of prison officials amounted to deliberate indifference to the inmate's health and safety. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (applying the deliberate indifference standard to a claim that a communicable disease threatened inmates' health and safety). The United States Court of Appeals for the Fourth Circuit has held

18

that for due process claims by pretrial detainees based on allegedly inadequate medical care, the Eighth Amendment deliberate indifference standard applies. *See, e.g., Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992) ("[P]rison officials violate [a] detainee's rights to due process when they are deliberately indifferent to serious medical needs."); *see also Young v. City of Mount Rainier*, 238 F.3d 567, 575 (4th Cir. 2001) ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause."). The Court will therefore similarly apply the Eighth Amendment standard to the closely related context of a claim by a pretrial detainee of a failure to ensure reasonable safety from a communicable disease.

Under this standard, a plaintiff must satisfy a two-part inquiry that includes both an objective and a subjective component. *See Raynor*, 817 F.3d at 127. First, a plaintiff must show objectively "a serious deprivation" of rights "in the form of a serious or significant physical or emotional injury," *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014), or "a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions," *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" may violate the Constitution, even if "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33–34; *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011). To establish the subjective component, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991) (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C.*

*Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Although Hammock asserts that the three detainees who had tested positive were not removed from the housing unit, he has not alleged any other facts demonstrating that the conditions during this quarantine, over a year after COVID-19 vaccinations became available, were unconstitutional. Notably, Hammock has not described the housing unit in any way, including how close his cell was to those of the detainees who tested positive; how much, if at all, they were required to interact; and what social distancing, sanitation, or other health measures were or were not implemented. He also has not alleged that he or any other inmates contracted COVID-19 from these individuals during the quarantine period. Although Hammock asserts in a later filing that he contracted COVID-19 in his housing unit, he has submitted a medical record stating that he tested positive on or about May 28, 2022, over four months after the quarantine period ended. Opp'n Corr. Defs.' Mot. Summ. J. at 2, ECF No. 26; ECF No. 18-1. Under these circumstances, the Court concludes that Hammock has not alleged sufficient facts to state a plausible claim that the temporary quarantine arrangement was unconstitutional. The Motion will therefore be dismissed as to this claim.

### E.   Medical Claims

Defendants assert that Hammock has failed to state plausible constitutional claims arising from the allegedly inadequate medical care relating to his hernia, sciatica, and eye injury. Although a pretrial detainee's claim for inadequate medical treatment while in custody arises under the Fourteenth Amendment, as discussed above, the Fourth Circuit applies Eighth Amendment precedents in considering a pretrial detainee's Fourteenth Amendment claim based on inadequate medical care. *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Under the Eighth Amendment

standard for such a claim, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle,* 429 U.S. at 106. Such deliberate indifference requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the defendant had actual knowledge of the risk posed to the plaintiff by the medical need but disregarded it and failed to arrange for the necessary medical care. *See Iko v. Shreve,* 535 F.3d 225, 241 (4th Cir. 2008); *Mays,* 992 F.3d at 300 (stating that a pre-trial detainee's medical deliberate indifference claim requires both an objective and subjective component).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). A medical condition is serious when it is one that has been diagnosed by a physician as mandating treatment is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko,* 535 F.3d at 241 (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey,* 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry,* 841 F.3d 219, 225 (4th Cir. 2016). Under this standard, a mere disagreement between an inmate and a

physician over the appropriate level of care does not support a constitutional claim, absent exceptional circumstances. *Id.*

### 1.   The Correctional Defendants

To the extent that Hammock seeks to hold the Correctional Defendants liable for deliberate indifference to his medical needs, he must identify the defendant personally responsible for the violation, because the doctrine of *respondeat superior*, or vicarious liability, is not applicable to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Under § 1983, a supervisory official may be held liable if it is established that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983).

Among the Correctional Defendants, Hammock identifies Director Watts as responsible for the failure to address his hernia issue and eye injury because he reported the problems to her and they were not addressed. As to these issues, where Hammock has asserted that he directly notified Dr. Barnes of his hernia and eye problems, there is no basis to claim that Director Watts is liable based on a failure to notify the medical staff of his medical needs or by preventing him from gaining access to the medical staff. Rather, correctional personnel typically are not liable for deliberate indifference when they allow the medical staff to make decisions about medical care.

*See Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990) (noting that a warden was entitled to rely upon the health care providers' expertise); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (stating that "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands"); *Shelton v. Angelone*, 148 F. Supp. 2d 670, 678 (W.D. Va. 2001) ("Prison personnel may rely on opinion of the medical staff as to the proper course of treatment."). The Court therefore finds that Hammock has failed to state a claim against Director Watts for deliberate indifference to a serious medical need arising from the hernia or eye injury issues.

As to the claim relating to the sciatica pain, although Hammock generally asserts that he asked certain correctional officers to call the medical unit about his sciatica pain without result, Hammock has not identified the specific officers who allegedly failed to arrange for pain treatment or described any specific episode in which they prevented him from receiving treatment, as necessary to state a § 1983 claim. *Love-Lane*, 355 F.3d at 782. Even if he had, where Hammock's claim relating to the sciatica is not that he received no medical care, but that the medication provided did not alleviate his pain, his deliberate indifference claim, if any, is against the medical staff for its decisions on how to treat his pain.

As for the medical claim relating his placement on the top tier of the housing unit, Hammock acknowledges that Dr. Barnes and the medical staff have directed that he should not be placed in a top bunk or the top tier of the housing unit, and that he in fact has been placed in a lower bunk. He does not explain how placement in a lower bunk in a cell on the top tier of the housing unit creates such an adverse impact on him that it constitutes deliberate indifference to a serious medical need, and he has failed to identify the officers who designated him to such a

23

housing location or allege sufficient facts demonstrating that the unidentified officers were actually aware of the medical risk of placing him in the top tier.

Finally, where the allegations do not identity any specific correctional officer or specific instance in which there was a failure to report the sciatica pain or a failure to move Hammock to a lower tier, Hammond has not alleged sufficient facts to establish supervisory liability on the part of Director Watts on these claims.

Accordingly, the Court will grant the Correctional Defendants' Motion as to the Fourteenth Amendment claims in Counts 5 and 6 relating to Hammock's medical conditions.

### 2.    Dr. Barnes

As discussed above, the Court does not agree with Dr. Barnes's primary argument, that the original Complaint was entirely superseded by ECF No. 7, such that some or all of the claims of inadequate medical care are no longer before the Court.   Beyond that argument, Dr. Barnes generally asserts that Hammock's allegations are insufficient to state a plausible claim for relief. Here, however, Hammock has alleged that he has a piece of metal left inside his body after surgery, that it is causing regular bleeding in his urine and stool, that he informed Dr. Barnes of this issue in March 2020 and was told he would receive surgery soon, but that no action has been taken for approximately two years.   Likewise, his allegations of shooting pain that has not been adequately addressed for 29 months, and of an eye condition that involves daily pain, seeing red, and a "jumping" eye that has been left unresolved for almost a year, describe conditions that could arguably demonstrate a serious medical need, and where Hammock has asserted that he informed Dr. Barnes of these conditions, he has properly alleged subjective knowledge that could support a deliberate indifference claim.   While additional facts, such as facts contained in medical records or declarations from medical providers, could potentially establish that Hammock's conditions

were not serious, that the medical staff provided sufficient attention and treatment that they did not act with deliberate indifference, or that any failures to treat were the result of medical disagreements rather than deliberate indifference, Dr. Barnes has neither offered such facts nor sought summary judgment based on record evidence. At this point, where Dr. Barnes is seeking only dismissal under Rule 12(b)(6), and the Court must view the self-represented allegations liberally and in the light most favorable to Hammock, the Court will deny the Motion as to the claims against Dr. Barnes in Counts 5 and 6.

### 3. UMMC Doctors

In alleging that the "University Doctors" who conducted the February 5, 2020 surgery failed to remove a piece of metal from his body, Hammock acknowledged that one of the doctors told him that they had to leave the piece there. Compl. ¶ 12. There is nothing in the allegations that supports the conclusion that these surgeons subjectively chose to disregard medical need and to leave the piece in his body out of deliberate indifference. Rather, the allegations, at worst, support the conclusion that the physicians were unable to remove all of the pieces, whether because of negligence or circumstances beyond their control. Negligence, however, is not sufficient to support a § 1983 deliberate indifference claim. *See Scinto*, 841 F.3d at 225. To the extent that this claim could be construed as a claim of negligence or medical malpractice, such a claim would be a state law cause of action that requires that the plaintiff first exhaust administrative remedies by filing a claim with the Health Care Alternative Dispute Resolution Office ("HCADRO"), as required by the Maryland Health Care Malpractice Claims Act. *See* Md. Code Ann., Cts. & Jud. Proc., §§ 3-2A-01 to 2A-10 (West 2022); *Wilcox v. Orellano*, 115 A.3d 621, 625 (Md. 2015). Because Hammock has not completed this process, the Court will dismiss the claim against the UMMC doctors in Count 8 without prejudice. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (requiring a court

to dismiss a self-represented claim filed *in forma pauperis* if it fails to state a claim); *Rowland v. Patterson*, 882 F.2d 97, 97 (4th Cir. 1989) ("Maryland law requires medical malpractice claimants to exhaust an arbitration remedy provided by the state as a precondition to bringing any civil action on the claim in state or federal court."); *Lewis v. Waletzky*, 576 F. Supp. 2d 732, 735-736, 738 (D. Md. 2008) (dismissing a malpractice claim asserted under Maryland law for failure to comply with the requirements of the Maryland Health Care Malpractice Claims Act).

### F.    Commissary Claim

Finally, the Court will dismiss Hammock's claim in Count 7 against "Commissary Owner Dave" and certain Correctional Defendants arising from his claim that the BCDC commissary failed to reimburse him for $17.09 of goods that he did not receive. To the extent that Hammock asserts a constitutional due process claim, he has not alleged that the commissary is part of the county government. Generally, a prison commissary is not a state actor, as is required for a § 1983 claim. *See Bomer v. Access Catalog Co.*, 75 F. App'x 382, 383 (6th Cir. 2003) (holding that a vendor selling products to prisoners is not a state actor); *Ryidu-X v. Md. Div. of Corr.*, No. WDQ-14-1735, 2015 WL 4095522, at *4 (D. Md. July 6, 2015) (dismissing an § 1983 claim against Keefe Commissary Network because its contract to provide commissary items to prisoners does not render it a state actor); *Ahlgrim v. Keefe Grp., LLC*, No. 16-177 JB/GJF, 2016 WL 9819520, at *3 (D.N.M. Oct. 19, 2016) ("This Court has found no precedent . . . that holds that a private corporation acts under color of law by contracting with a state prison for the purposes of supplying commissary products to prisoners."); *Leatherwood v. Rios*, No. CIV-15-767-C, 2016 WL 7192684, at *4–5 (W.D. Okla. Oct. 13, 2016) (collecting cases and holding that Keefe Commissary Network was not a state actor subject to suit under § 1983); *Kyles v. Keefe Commissary Network*,

No. 14-cv-11907, 2015 WL 1637466, at *6 (E.D. Mich. Apr. 13, 2015) (same).  Accordingly, he has not stated a plausible § 1983 claim against the commissary owner.

As for the Correctional Defendants, although Hammock has stated that he asked them for assistance in getting the money returned, he has not plausibly alleged that they had any control, supervisory or otherwise, over the commissary owner.  Regardless, where the claim against the Correctional Defendants could at most be one for negligent deprivation of property, such a claim does not implicate the Due Process Clause.  *See Daniels v. Williams*, 474 U.S. 327, 335-36 (1986).  Accordingly, this claim will be dismissed under 28 U.S.C. § 1915(e)(2).

## CONCLUSION

For the foregoing reasons, the Correctional Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment will be GRANTED, and Dr. Barnes's Motion to Dismiss will be GRANTED IN PART and DENIED IN PART in that it will be granted as to the claim in Count 4 relating to the COVID-19 quarantine and the claim in Count 8 relating to the February 5, 2020 surgery and will be denied as to the claims in Counts 5 and 6.  Because Dr. Barnes interpreted the pleadings as not including the medical claims asserted in the original Complaint, the denial of the Motion on Counts 5 and 6 will be without prejudice.  Prior to filing any additional motions, Dr. Barnes must produce to Hammock all available medical records relating to the issues identified in Counts 5 and 6 from September 20, 2019 to the present.

The remaining claims in Counts 7 and 8 will be dismissed pursuant to 28 U.S.C. § 1915(e)(2).  Hammock's Second Motion for Appointment of Counsel will be DENIED WITHOUT PREJUDICE, and the Renewed Motion to Proceed in Forma Pauperis will be DENIED AS MOOT.  A separate Order shall issue.


Date:   March 10, 2023

THEODORE D. CHUANG
United States District Judge